Mark F. James (5295)
**HATCH, JAMES & DODGE, P.C.**
10 West Broadway, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 363-6363
Facsimile: (801) 363-6666
Email: mjames@hjdlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice forthcoming*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown (*pro hac vice application forthcoming*)
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Henry Monther, derivatively on behalf of POLARITYTE, INC.,<br><br>     Plaintiff,<br><br>     vs.<br><br>DENVER LOUGH, MICHAEL BEEGHLEY, WILLIE C. BOGAN, JEFF DYER, STEVEN GORLIN, JON MOGFORD, JOHN STETSON, and EDWARD SWANSON,<br><br>     Defendants,<br><br>     and<br><br>POLARITYTE, INC.,<br><br>     Nominal Defendant. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;**<br>**(2) BREACH OF FIDUCIARY DUTY; AND**<br>**(3) UNJUST ENRICHMENT**<br><br><u>JURY TRIAL DEMANDED</u><br><br>Case No.: 2:18-cv-00791<br><br>Judge: Tena Campbell |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Henry Monther ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant PolarityTE, Inc. ("PolarityTE" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Denver Lough, Michael Beeghley, Willie C. Bogan, Jeff Dyer, Steven Gorlin, Jon Mogford, John Stetson, and Edward Swanson (collectively, the "Individual Defendants," and together with PolarityTE, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of PolarityTE, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PolarityTE, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by PolarityTE's directors and officers from March 31, 2017 through the present (the "Relevant Period").

2.      PolarityTE operates as commercial-stage biotechnology and regenerative biomaterials company. The Company focuses on discovering, designing and developing a range of regenerative tissue products and biomaterials for the fields of medicine, biomedical engineering, and material sciences.

3.      The Company's flagship development is SkinTE, which is designed to use a patient's own skin cells to fill voids left by, for example, wounds or burns. The regrown skin is full thickness and bears hair.

4.      The Company was formed through a merger between Majesco Entertainment Company and PolarityTE, Inc. ("Polarity NV"), which closed on April 5, 2017 (the "Merger").

5.      At the time of the Merger, the only asset of Polarity NV was patent application #14/954,335 (the "Patent").

6.      On March 31, 2017, the U.S. Patent and Trademark Office (the "USPTO") issued a non-final rejection of the Patent.

7.      On June 4, 2018 the USPTO issued its final rejection of the Patent.

8.      Despite these rejections, and the reality that the Company possessed no issued patents, the Individual Defendants caused the Company to fail to disclose the USPTO's rejections of the Patent, while Defendant Denver Lough represented in multiple interviews that the Company possessed patents on its technology.

9.      On June 25, 2018, Citron Research published a report disclosing the patent rejections and the Company's failure to disclose them.

10.     On this news, the price per share of PolarityTE stock fell $10.59, or 27%, from the previous day's trading price, closing at $28.14 on June 25, 2018.

11.     The price of PolarityTE's stock continued to drop the following day, closing at $26.41 on June 26, 2018.

12.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

13.     In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

14.     Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to PolarityTE, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Patent received a non-final notice of rejection on May 31, 2017, prior to the closing of the Merger; (2) a final rejection was assigned to the Patent on June 4, 2018; (3) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent application; and (4) the Company failed to maintain internal controls.

15.     As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

16.     The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO") and Chief Scientific Officer

("CSO"), and one of the members of its Board of Directors to two federal securities fraud class action lawsuits pending in this Court (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and will likely cost the Company going forward millions of dollars.

18.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

21.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

22.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Utah or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

25.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26.     Plaintiff is a current shareholder of PolarityTE. Plaintiff has continuously held PolarityTE common stock at all relevant times.

### Nominal Defendant PolarityTE

27.     PolarityTE is a Delaware corporation with its principal executive offices at 1960 S. 4250 West, Salt Lake City, Utah 84104. PolarityTE's shares trade on the NASDAQ under the ticker symbol "PTE."[1]

### Defendant Lough

28.     Defendant Dr. Denver. Lough ("Lough") served as the Company's CEO, CSO and Chairman since December 1, 2016. According to the Company's Schedule 14A filed with the SEC

---

[1] Prior to September 18, 2018, the Company's stock traded under the ticker symbol "COOL."

on September 13, 2017 (the "2017 Proxy Statement"), as of September 12, 2017, Defendant Lough beneficially owned 7,508,336 shares of the Company's common stock, which represented 54.63% of the Company's outstanding common stock.[2] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Lough owned approximately $195.3 million worth of PolarityTE's stock.

29.     The Company's Schedule 14A filed with the SEC on August 17, 2018 (the "2018 Proxy Statement") stated that, as of August 9, 2018, Defendant Lough beneficially owned 8,133,333 shares of the Company's common stock, which represented 36.3% of the Company's outstanding common stock.[3]

30.     For the fiscal year ended October 31, 2017, Defendant Lough received $2,536,250 in compensation from the Company. This included $315,000 in salary, a $100,000 bonus, and $2,121,250 in option awards.

31.     On November 10, 2017, the Company entered into a new employment agreement with Defendant Lough, pursuant to which Defendant Lough received a $150,000 continuation bonus and his base salary was increased to $530,000 per year. Under the new employment agreement, Defendant Lough's bonus eligibility is 100% of his base salary.

---

[2] Represented (i) 458,336 shares of Common Stock which represents the vested portion (including shares vesting within 60 days) of an option to purchase 1,000,000 shares of Common Stock under the 2017 Plan which option vests in 24 equal monthly installments and (ii) 7,050,000 shares of Common Stock underlying shares of Series E Convertible Preferred Stock. Due to the fact that Series E shares were entitled to 2 votes for every share of common stock that it was convertible into, Defendant Lough possessed approximately 67.81% of the outstanding voting power as of September 12, 2017.

[3] Includes 1,083,333 shares of options that were exercisable and/or restricted share awards expected to vest within 60 days of August 9, 2018. On March 6, 2018, the Company received a conversion notice for all of Defendant Lough's Series E Preferred shares.

32.    The Company's 2018 Proxy Statement stated the following about Defendant

Lough:

> ***Dr. Denver Lough, 36,***[4] was appointed our Chairman, Chief Executive Officer and
> Chief Scientific Officer on December 1, 2016 and has continued to serve in this
> capacity throughout 2018. Prior to this appointment served both clinical and
> research roles at multiple institutions. From 2012 until 2016 Dr. Lough was a
> Plastic & Reconstructive Surgery House Staff Officer at Johns Hopkins University
> School of Medicine, Department of Plastic & Reconstructive Surgery. Dr. Lough
> also founded PolarityTE, LLC, PolarityTE NV and Lough & Associates LLC
> which are engaged in the business of developing biomedical intellectual property
> and related fields. Dr. Lough has received numerous accolades and awards by
> national societies related to basic and translational science applications in tissue
> engineering, regenerative medicine, and immunology as well as within solid organ
> and reconstructive transplantation. We believe that Dr. Lough is qualified to serve
> as a member of our Board because of his experience in clinical medicine, surgery,
> research as well as the development and innovation of technologies related to
> regenerative medicine and related patent applications and intellectual property
> which the Company has reviewed for potential development. Dr. Lough holds an
> M.D. and PhD in Biochemistry, Molecular and Cell Biology from Georgetown
> University, which he earned in 2012.[ ]Dr. Lough has served within the Department
> of Surgery and Institute for Plastic Surgery Southern Illinois University School of
> Medicine and Translational Research Director at Laboratory for Regenerative
> Medicine and Applied Sciences. He has served within the Laboratories for
> Craniomaxillofacial Regenerative Medicine at the Johns Hopkins Hospital
> Department of Plastic and Reconstructive Surgery. In addition, Dr. Lough was a
> lead research associate in the Vascularized Composite Allotransplantation
> Laboratory at the Johns Hopkins Hospital Department of Plastic and Reconstructive
> Surgery and has been a research consultant to the Johns Hopkins Hendrix Burn
> Research Center. He has also served within the Brady Urological Institute at the
> Johns Hopkins School of Medicine. Dr. Lough was assembled as a member among
> other burn experts as a Taiwanese presidential disaster response team following the
> largest civilian burn disaster in 2015.
>
> From 2012 until 2016 Dr. Lough was a Plastic & Reconstructive Surgery House
> Staff Officer at Johns Hopkins University School of Medicine, Department of
> Plastic & Reconstructive Surgery. Dr. Lough also founded PolarityTE, LLC,
> PolarityTE NV and Lough & Associates LLC which are engaged in the business of
> developing intellectual property related to regenerative medicine and related fields.
> Dr. Lough has received numerous accolades and awards by national societies
> related to basic and translational science applications in tissue engineering,
> regenerative medicine, and immunology as well as within solid organ and
> reconstructive transplantation. We believe that Dr. Lough is qualified to serve as a

---

[4] Emphasis in original unless otherwise noted throughout.

member of our Board because of his experience in clinical medicine and surgery as well as the development and innovation of technologies related to regenerative medicine and related patent applications and intellectual property which the Company has reviewed for potential development. Dr. Lough holds an M.D. and PhD in Biochemistry, Molecular and Cell Biology from Georgetown University, which he earned in 2012.

**Defendant Stetson**

33.     Defendant John Stetson ("Stetson") on served as the Company's Chief Investment Officer from June 20, 2018 until he was terminated from all positions at the Company on September 7, 2018. He previously served as a director from December 2016 to June 29, 2018, and as the Company's Chief Financial Officer, Executive Vice President and Secretary from September 2015 to June 2018. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Stetson beneficially owned 478,811 shares of the Company's common stock, representing 7.57% of the Company's outstanding common stock.[5] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Stetson owned approximately $12.5 million worth of PolarityTE's stock.

34.     According to a press release issued by the Company on September 7, 2018, Defendant Stetson was terminated as a result of his being named in a complaint filed that day by the SEC against Defendant Stetson and a number of other individuals (the "SEC Action"). Other named defendants in the SEC Action include Barry Honig, who held approximately 9% of the Company's outstanding stock as of August 9, 2018 and Dr. Philip Frost, who was an early investor

---

[5] Defendant Stetson is the President of Stetson Capital Investments, Inc. ("Stetson Capital"), and the Trustee of Stetson Capital Investments, Inc. Retirement Plan ("Stetson Retirement Plan"). In these capacities, he has voting and dispositive control over the securities held by such entities. Defendant Stetson's shareholdings represented (i) 332,423 shares of Common Stock held by Defendant Stetson, (ii) 19,444 shares of Common Stock held by Stetson Capital, (iii) 39,444 shares of Common Stock held by Stetson Retirement Plan and (iv) an option to purchase 87,500 shares of Common Stock pursuant to the 2016 Plan.

in the Company through the Frost Gamma Investments Trust, which is also a named defendant in the SEC Action.

35.     For the fiscal year ended October 31, 2017, Defendant Stetson received $719,250 in compensation from the Company. This included $168,000 in salary and $551,250 in stock awards.

36.     The Company's 2018 Proxy Statement stated the following about Defendant Stetson:

> ***John Stetson, 33,*** has served as our Chief Investment Officer since June 20, 2018. He served as our Chief Financial Officer, Executive Vice President and Secretary from September 2015 to June 2018, and served as a director form [sic] December 2016 through June 2018. Mr. Stetson has been the Managing Member of HS Contrarian Investments LLC, a private investment firm with a focus on early stage companies since 2010. In addition, Mr. Stetson served as Executive Vice President, Chief Financial Officer, and Director of Marathon Patent Group, Inc. (MARA), a NASDAQ listed patent monetization company from June 2012 to February 2015. Mr. Stetson was President & Co-Founder of Fidelity Property Group, Inc. from April 2010 to July 2014, a real estate development group focused on acquisition, rehabilitation, and short-term disposition of single family homes. Mr. Stetson received his BA in Economics from the University of Pennsylvania.

**Defendant Swanson**

37.     Defendant Dr. Edward Swanson ("Swanson") served as a Company director from December 2016 until his resignation on August 7, 2018. He has served as the Company's Chief Operating Officer since December 2016. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Swanson beneficially owned 389,309 shares of the Company's common stock, which represented 5.88% of the Company's outstanding common stock.[6] Given that the

---

[6] Represented (i) 370 shares of Common Stock, (ii) 387,750 shares of Common Stock which represents the vested portion (including shares vesting within 60 days) of an option to purchase 846,000 shares of Common Stock under the 2017 Plan which option vests in 24 equal monthly installments and (iii) 1,189 shares of Common Stock acquired by Edward Swanson Roth IRA ("Roth IRA"). Defendant Swanson is the Trustee of Roth IRA and in such capacity has voting and dispositive control over the securities held by such entity.

price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Swanson owned over $10.1 million worth of PolarityTE's stock.

38.     For the fiscal year ended October 31, 2017, Defendant Swanson received $2,164,578 in compensation from the Company. This included $270,000 in salary, a $100,000 bonus, and $1,794,578 in option awards.

39.     On November 10, 2017, the Company entered into a new employment agreement with Defendant Swanson, pursuant to which Defendant Swanson received a $100,000 continuation bonus and his base salary was increased to $400,000 per year. Under the new employment agreement, Defendant Swanson's bonus eligibility is 100% of his base salary.

40.     The Company's 2017 Proxy Statement stated the following about Defendant Swanson:

> **Dr. Edward Swanson, 33,** was appointed as Chief Operating Officer and Director of the Company on December 1, 2016. Following completion of his undergraduate degree in Applied Sciences in Biomedical Sciences at the School of Engineering and Applied Sciences at the University of Pennsylvania, Dr. Swanson received his medical degree from Harvard Medical School, where he attended as a student from August 2008 to May 2012, graduating with honors for his thesis researching surgical outcomes within craniofacial and plastic surgery. From July 2012 until December 2016, Dr. Swanson was a Surgical Resident in Plastic & Reconstructive Surgery in the Department of Plastic and Reconstructive Surgery at The Johns Hopkins University School of Medicine. During his time at Johns Hopkins, he served in a leadership role within the residency, sitting on the Program Evaluation Committee from July 2015 to December 2016, and The Johns Hopkins Hospital House staff Patient Safety and Quality Council from July 2014 to June 2015. Dr. Swanson has extensive experience in basic and translational biomedical research, including as a research associate in Wound Healing in the Division of Plastic Surgery at the Brigham and Women's Hospital and Harvard Medical School from May 2004 to August 2004, thesis student in Traumatic Brain Injury at the University of Pennsylvania from August 2006 to May 2007, research fellow in Pancreatic Cancer Cellular Biology at the Brigham and Women's Hospital and Harvard Medical School from July 2007 to July 2008, research fellow in Nanomedicine at Harvard Medical School and MIT from May 2008 to August 2008, and research fellow in Vascularized Composite Allotransplantation at the Massachusetts General Hospital and Harvard Medical School during his final year of medical school. In addition, Dr. Swanson directed large animal translational

11

research as a lead research associate in the Vascularized Composite Allotransplantation Laboratory in the Department of Plastic and Reconstructive Surgery at The Johns Hopkins University School of Medicine from July 2014 to June 2015, overseeing experimental projects funded by multimillion dollar grants. Furthermore, Dr. Swanson has demonstrated national and international leadership throughout the field of plastic and reconstructive surgery at a young age, with greater than 40 peer-reviewed publications, five book chapters, and 30 national/international conference presentations. We believe that Dr. Swanson is qualified to serve as a member of our Board because of his experience in technology related to regenerative medicine and related technologies and their clinical applications, which the Company has reviewed for potential development.

**Defendant Beeghley**

41.    Defendant Michael Beeghley ("Beeghley") served as a Company director from December 2015 to October 18, 2017. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Beeghley beneficially owned 79,751 shares of the Company's common stock, representing 1.28% of the Company's outstanding common stock.[7] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Beeghley owned approximately $2.1 million worth of PolarityTE's stock.

42.    For the fiscal year ended October 31, 2017, Defendant Beeghley received $52,250 in compensation from the Company. This included $5,000 in fees earned or paid in cash and $47,250 in option awards.

43.    The Company's Schedule 14A filed with the SEC on April 21, 2016 stated the following about Defendant Beeghley:

**Michael Beeghley**, age 49, was appointed to our Board of Directors in December 2015. Mr. Beeghley has been President and founder of Applied Economics LLC ("Applied Economics"), a national corporate finance and financial advisory

---

[7] Represented (i) 28,541 shares of Common Stock, (ii) an option to purchase 1,587 shares of Common Stock, (iii) an option to purchase 5,208 shares of Common Stock pursuant to the 2016 Plan, (iv) an option to purchase 1,915 shares of Common Stock, and (v) 42,500 shares of Common Stock held by Applied Economics LLC Profit Sharing Plan ("Applied Economics"). Defendant Beeghley is the trustee of Applied Economics and in such capacity has voting and dispositive power over the securities held by such entity.

services firm for 18 years. Mr. Beeghley has testified as an expert and provided expert opinions on numerous economic, financial and securities issues. Prior to forming Applied Economics, Mr. Beeghley was a Manager in the Corporate Finance Group of Ernst & Young, LLP and a Senior Analyst in the Corporate Finance Group of PricewaterhouseCoopers. Mr. Beeghley is qualified to serve as a director due to his extensive corporate finance background.

**Defendant Bogan**

44.     Defendant Willie C. Bogan ("Bogan") has served as a Company director since April 2018. A press release issued by the Company on April 24, 2018 announcing Defendant Bogan's addition to the Board, stated, in relevant part:

> During his tenure as a business and securities attorney, Mr. Bogan was involved in a variety of substantial commercial transactions and was an advisor to directors and executive management in the boardroom. Through this, Mr. Bogan acquired significant business and financial experience, including in relation to lending, borrowing, hedging, capital deployment, financial results, mergers and acquisitions, risks and risk management. Regarding healthcare, he acquired significant insight into supply chain systems and activities, and into the nature, opportunities and challenges of healthcare technology businesses. Mr. Bogan also has extensive corporate governance experience.

45.     Pursuant to the new Director Compensation Policy approved by the Board on November 10, 2017, Defendant Bogan is entitled to receive the following compensation in exchange for his service as a director: a quarterly cash retainer or $10,000, 10-year options to purchase shares of Company stock valued at $150,000, $1,500 for each board meeting attended, $800 for each committee meeting attended, and $500 for each teleconference called by the Chairman, a committee chair, or the President of the Company.

46.     The Company's 2018 Proxy Statement stated the following about Defendant Bogan:

> **Willie C. Bogan** joined the Board in April 2018. Mr. Bogan served as Associate General Counsel and Corporate Secretary of McKesson Corporation ("McKesson"), a San Francisco-based healthcare services and information technology company currently ranked 6th on the Fortune 500, from July 2009 until his retirement from McKesson in November 2015. He joined McKesson in

November 2006 as Associate General Counsel and Assistant Secretary. Before joining McKesson, Mr. Bogan held senior advisory positions at the following public companies in the San Francisco Bay Area: Bank of America; Safeway; Charles Schwab; and Catellus Development Corporation, a real estate development company. Prior to becoming in-house counsel, he was a partner at Steinberg, Miller Bogan & Goldstein in Manhattan Beach, California. He started his law career as a law firm associate in Los Angeles, California. Mr. Bogan graduated Phi Beta Kappa and Summa Cum Laude from Dartmouth College where he majored in Spanish. He received an M.A. degree in Politics and Economics from Oxford University where he studied as a Rhodes Scholar. He earned his J.D. degree from Stanford Law School. Mr. Bogan is qualified to serve as a member of the Board because of his knowledge of the healthcare industry and his experience as an advisor to public companies and their boards of directors on securities law and corporate governance matters.

**Defendant Dyer**

47.     Defendant Jeff Dyer ("Dyer") has served as a Company director since March 2, 2017, and is the Chair of the Audit Committee. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Dyer beneficially owned 64,625 shares of the Company's common stock.[8] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Dyer owned approximately $1.7 million worth of PolarityTE's stock.

48.     For the fiscal year ended October 31, 2017, Defendant Dyer received $292,699 in compensation from the Company. This included $5,000 in fees earned or paid in cash and $287,699 in option awards.

49.     The Company's 2018 Proxy Statement stated the following about Defendant Dyer:

Jeff Dyer was appointed to our Board of Directors on March 2, 2017. Mr. Dyer has served as the Horace Beesley Professor of Strategy at Brigham Young University since September 1999. From August 1993 until September 1999 he served as an Assistant Professor at Wharton School, University of Pennsylvania, and from July 1984 until September 1988 he served as Management Consultant and Manager of

---

[8] Represented 64,625 shares of Common Stock which represents the vested portion (including shares vesting within 60 days) of an option to purchase 141,000 shares of Common Stock under the 2017 Plan which option vests in 24 equal monthly installments.

Bain & Company. Mr. Dyer received his Bachelor of Science degree in psychology and MBA from Brigham Young University and his PhD in management from University of California, Los Angeles. Mr. Dyer is qualified to serve as a member of the Company's Board because of his extensive business and management expertise and knowledge of capital markets.

**Defendant Gorlin**

50.     Defendant Steve Gorlin ("Gorlin") has served as a director since 2017, and is a member of the Audit Committee. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Gorlin beneficially owned 18,751 shares of the Company's common stock.[9] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Gorlin owned over $487,713 worth of PolarityTE's stock.

51.     For the fiscal year ended October 31, 2017, Defendant Gorlin received $400,688 in compensation from the Company. This included $5,000 in fees earned or paid in cash, $237,000 in stock awards, and $158,688 in option awards.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Gorlin:

**Steve Gorlin** joined the Board in February 2017. Mr. Gorlin helped found several biotechnology and pharmaceutical companies over the past 40 years, including Hycor Biomedical, Inc. (acquired by Agilent), Theragenics Corporation (NYSE: TGX), CytRx Corporation (NASDAQ: CYTR), Medicis Pharmaceutical Corporation (acquired by Valeant), EntreMed, Inc. (NASDAQ: ENMD), MRI Interventions, DARA BioSciences, Inc. (NASDAQ: DARA), MiMedx Group, Inc. (NASDAQ: MDXG), and Medivation, Inc. (NASDAQ: MDVN). Since December 2014, Mr. Gorlin has served as a director of Catasys, Inc. and Co-Chairman of the board of directors of Medovex, Inc., and since May 2011 he has served on the board of directors of NTC China, Inc. In addition, since 2011, Mr. Gorlin has served as a member of the board of directors of DemeRX, Inc. ("DemeRX") and from 2011 until 2012 he served as Chairman of the board of DemeRX. Since July 2015, he has also served as Vice Chairman of the board of NantKwest, Inc. and from July 2013 until May 2015 he served on various executive committees and the board of

---

[9] Represented 18,751 shares of Common Stock which represents the vested portion (including shares vesting within 60 days) of an option to purchase 50,000 shares of Common Stock under the 2017 Plan which option vests in 24 equal monthly installments.

directors of Conkwest, Inc., a private company, which is now NantKwest, Inc. From November 2006 until June 2013, Mr. Gorlin served as a member of the board of directors of MiMedx Group, Inc. From 2010 until 2014 Mr. Gorlin served on the Business Advisory Council to the Johns Hopkins School of Medicine, from 2011 until 2013 he served on The Johns Hopkins BioMedical Engineering Advisory Board and from 2007 until 2011 he served on the Board of the Andrews Institute. He is presently a member of the Research Institute Advisory Committee (RIAC) of Massachusetts General Hospital. Mr. Gorlin founded a number of non-medical related companies, including Perma-Fix, Inc., Pretty Good Privacy, Inc. (sold to Network Associates), Judicial Correction Services, Inc. (sold to Correctional Healthcare) and NTC China, Inc. He started The Touch Foundation, a nonprofit organization for the blind and was a principal financial contributor to the founding of Camp Kudzu for diabetic children. Mr. Gorlin is qualified to serve as a member of the Company's Board because of his experience in regenerative medicine and pharmaceutical drug and medical device research and development.

**Defendant Mogford**

53.     Defendant Dr. Jon Mogford ("Mogford") has served as a Company director since February 2017. According to the 2017 Proxy Statement, as of September 12, 2017, Defendant Mogford beneficially owned 18,751 shares of the Company's common stock.[10] Given that the price per share of the Company's common stock at the close of trading on September 12, 2017 was $26.01, Mogford owned over $487,713 worth of PolarityTE's stock.

54.     For the fiscal year ended October 31, 2017, Defendant Mogford received $400,688 in compensation from the Company. This included $5,000 in fees earned or paid in cash, $237,000 in stock awards, and $158,688 in option awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant Mogford:

Dr. Jon Mogford was appointed to our Board of Directors on February 8, 2017. Dr. Mogford has served in various capacities for the Texas A&M University System ("Texas A&M"). Since May 2013, Dr. Mogford has served as the Vice Chancellor for Research, from August 2012 until April 2013 he served as the Chief Research

---

[10] Represented 18,751 shares of Common Stock which represents the vested portion (including shares vesting within 60 days) of an option to purchase 50,000 shares of Common Stock under the 2017 Plan which option vests in 24 equal monthly installments.

Officer and from November 2011 until August 2012 he served as Associate Vice Chancellor for Strategic Initiatives at Texas A&M. Prior to joining Texas A&M in 2011, from February 2010 until October 2011, Dr. Mogford served as Deputy Director of the Defense Sciences Office (DSO) of the Defense Advanced Research Projects Agency (DARPA) in the U.S. Department of Defense. From July 2005 until January 2009, Dr. Mogford served as Program Manager of DSO of DARPA. In addition, since November 2016, Dr. Mogford has served as a member of the board of directors of Medovex Corp. Dr. Mogford is the recipient of the Secretary of Defense Medal for Outstanding Public Service. Dr. Mogford obtained his bachelor's degree in Zoology from Texas A&M University and doctorate in Medical Physiology from the Texas A&M University Health Science Center, College Station, Texas. His research in vascular physiology continued at the University of Chicago as a Postdoctoral fellow from 1997 until 1998. Dr. Mogford transitioned his research focus to the field of wound healing at Northwestern University, both as a Research Associate and also as a Research Assistant Professor from 1998 until 2003. He then served as a Life Sciences Consultant to DARPA on the Revolutionizing Prosthetics program from December 2003 until June 2005. Dr. Mogford is qualified to serve as a member of the Company's Board because of his experience and research in regenerative medicine.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers and/or directors of PolarityTE and because of their ability to control the business and corporate affairs of PolarityTE, the Individual Defendants owed PolarityTE and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage PolarityTE in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of PolarityTE and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to PolarityTE and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of PolarityTE, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of PolarityTE were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PolarityTE, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised PolarityTE's Board at all relevant times.

61.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

62.     To discharge their duties, the officers and directors of PolarityTE were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of PolarityTE were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Utah, and the United States, and pursuant to PolarityTE's own Code of Conduct and Business Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how PolarityTE conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of PolarityTE and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that PolarityTE's operations would comply with all applicable laws and PolarityTE's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.     Each of the Individual Defendants further owed to PolarityTE and the shareholders the duty of loyalty requiring that each favor PolarityTE's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.     At all times relevant hereto, the Individual Defendants were the agents of each other and of PolarityTE and were at all times acting within the course and scope of such agency.

65.     Because of their advisory, executive, managerial, and directorial positions with PolarityTE, each of the Individual Defendants had access to adverse, non-public information about the Company.

66.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PolarityTE.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

68.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

69.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of PolarityTE was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

70.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PolarityTE, and was at all times acting within the course and scope of such agency.

## POLARITYTE'S CODE OF CONDUCT

72.     Pursuant to the Company's Code of Conduct and Business Ethics (the "Code of Conduct"), the Code of Conduct "applies to all employees, Officers and Directors of PolarityTE, Inc. and its subsidiaries worldwide (collectively, 'Polarity', 'POLARITY', 'Company', 'we', 'us' or 'our')."

73.     The Code of Conduct provides, as to "Compliance with Laws and Regulations," in relevant part, that:

> Our global business operations are highly regulated. Obeying laws and regulations, both in letter and in spirit, is the foundation upon which this Code is built and how our Company conducts its business. It is the responsibility of all POLARITY Personnel to be familiar with and to comply with the governmental and other laws, rules and regulations that apply to our operations.

74.     The Code of Conduct provides, as to a "Record Keeping," in relevant part, that:

> The Company is required to compile and maintain numerous records and substantial information, and to file reports and applications with various government agencies. Virtually all of these agencies operate under laws that make it a crime – punishable by fines and/or imprisonment – to knowingly submit false or incomplete information, to fail to submit required information, or to fail to

submit information within the required time period. Carelessness alone may be viewed as constituting an offense in some instances and may, however incorrectly, call into question the Company's competency and good faith. Accordingly, Polarity requires POLARITY Personnel that prepare information, records, or submissions for governmental agencies, or who otherwise deal with such agencies, to do so in a diligent, accurate, timely, and ethical manner.

75.     The Code of Conduct provides, as to "Public Disclosure," in relevant part, that:

Full, fair, accurate, timely, and understandable financial disclosure is required in all reports and documents that the Company files with, or submits to, any regulatory body, including the Securities and Exchange Commission (the "SEC"), as well as in any public communications.

***All POLARITY Personnel who participate in the preparation of any part of the Company's financial statements, SEC and other regulatory financial disclosures and/or other public communications – including, but not limited to, the principal executive officer, the principal financial officer, the controller or principal accounting officer, and any other employee who performs a similar function – have a responsibility to ensure that these disclosures and communications are complete and accurate and that they do not contain any false or materially misleading entries or information.***

POLARITY Personnel with concerns regarding the Company's SEC disclosures, accounting or internal accounting controls or auditing matters must report those concerns promptly using one of the mechanisms discussed in Section 12 below or by contacting the Audit Committee directly in accordance with the Company's Audit Committee Procedures for Handling Accounting and Auditing Complaints and Concerns.

(Emphasis added.)

76.     The Code of Conduct provides, as to "Submitting Complaint and Reporting Potential Violations," in relevant part that:

All POLARITY Personnel have a duty to promptly report concerns about suspected violations of our Code, our policies and procedures, and any applicable laws and regulations. ***A failure to report a known or suspected violation of this Code is a Code violation in itself***.

POLARITY Personnel may report known or suspected violations of this Code and the legal requirements it covers to his or her manager, Human Resources, and/or to Polarity' General Counsel. Employees may also report Code violations or any compliance-related concerns through the Polarity Hotline . . . or by going to the Polarity Intranet . . . Such reports may be made anonymously.

(Bold and italic emphasis added, red text in original.)

77.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

78.     PolarityTE operates as commercial-stage biotechnology and regenerative biomaterials company. The Company focuses on discovering, designing and developing a range of regenerative tissue products and biomaterials for the fields of medicine, biomedical engineering, and material sciences. Its PolarityTE platform would be able to provide transform tissue regeneration, including potential regeneration of multiple tissue substrates, such as skin, bone, muscle, fat, cartilage, nerves, and blood vessels, as well as neural elements, solid and hollow organ composite tissue systems.

79.     The Company's flagship development is SkinTE, which is designed to use a patient's own skin cells to fill voids left by events such as wounds or burns. The regrown skin is full thickness and bears hair.

80.     PolarityTE, as it exists today, was formed through a merger between Majesco Entertainment Company and PolarityTE, Inc. ("Polarity NV") These companies entered into an agreement for Majesco to acquire Polarity NV on December 1, 2016.

81.     Also, on December 1, 2016, Majesco hired Defendant Lough as CEO, CSO and Chairman and hired Defendant Swanson as COO. Defendants Lough and Swanson staked their personal and professional futures on the success of the Company, as both irrevocably departed from prestigious residencies at Johns Hopkins Hospital Department of Plastic and Reconstructive Surgery in order to run PolarityTE.

82.     As explained in the Company's quarterly report for the period ended January 31, 2017, filed with the SEC on March 16, 2017 (the "Q1 2017 10-Q"), the Merger was designed to provide the Company ownership of intellectual property belonging to Defendant Lough. The Q1 2017 10-Q stated, in relevant part:

> Dr. Lough is the named inventor under a pending patent application for a novel regenerative medicine and tissue engineering platform filed in the United States and elsewhere. The Company believes that its future success depends significantly on its ability to protect its inventions and technology. Accordingly, the Company is seeking to acquire the pending patent application. Prior to December 1, 2016 no employees, consultants or partners engaged in any business activity related to the patent application and no licenses or contracts were granted related to the patent application, other than professional services related to preparation and filing of the patent. On December 1, 2016 *Dr. Lough assigned the patent application as well as all related intellectual property to a newly-formed Nevada corporation, PolarityTE, Inc. ("Polarity NV"), and the Company entered into an Agreement and Plan of Reorganization (the "Agreement") with Polarity NV and Dr. Lough*.
>
> As a result, at closing, the patent application would be owned by the Company without the need for further assignments or recordation with the Patent Trademark Office.
>
> There was never any intent to acquire an ongoing business and no ongoing business was acquired. *The asset is preserved in a stand-alone entity merely as a vehicle to provide the Company a seamless means to acquire the asset (a patent application) without undue cost, expense and time. Polarity NV has never had employees and therefore no employees will be acquired in the transaction*.

(Emphasis added.) Upon information and belief, the Q1 2017 10-Q's reference to the patent application is referring to the Patent.

83.     Prior to the Merger, Defendant Lough owned 100% of the issued and outstanding shares of capital stock of Polarity NV.

84.     At the closing of the Merger, Defendant Lough was issued 7,050 shares of the Company's newly authorized Series E Preferred Stock (the "Preferred Shares") convertible into an aggregate of 7,050,000 shares of the Company's common stock, representing 40.95% of the Company's then-issued and outstanding shock on an as diluted basis. The Preferred Shares were entitled to 2 votes for every 1 share of common stock. At the time of the merger, it was reported that Defendant Lough's shares had a fair value of approximately $104.7 million.[11]

85.     The Merger closed on April 5, 2017. On April 7, 2017, the Company announced that the Merger had been completed.

86.     On June 23, 2017, the Company entered into an agreement divesting all of its gaming assets. Since the divestment of its gaming assets, the Company has operated exclusively as in the area of regenerative medicine.

87.     On March 29, 2018, the Company filed an S-8 Registration Statement with the SEC.

88.     On June 4, 2018, the Company issued a press release announcing a public offering of shares of common stock. With respect to proceeds of the sale, the press release asserted that:

> PolarityTE intends to use the net proceeds from the offering for research and development of its products and product candidates, efforts toward

---

[11] On March 6, 2018, the Company received a conversion notice for all of Defendant Lough's Series E Preferred shares.

commercialization and required registration or approval of its products and product candidates with applicable regulatory authorities and general corporate purposes.

89.     On June 5, 2018, the Company announced that the follow-on public offering had been priced, and was expected to generate gross proceeds of approximately $55 million.

### The Patent

90.     The patent application obtained through the Merger was patent #14/954,335 (the "Patent").

91.     On March 31, 2017, the USPTO issued a non-final rejection of the Patent.

92.     On April 7, 2017—the same day that the Merger was completed—the USPTO mailed its non-final rejection of the Patent.

93.     On June 4, 2018, the USPTO issued a final rejection of the Patent.

94.     On June 14, 2018, the USPTO mailed its final rejection of the Patent.

95.     Despite these developments, the Individual Defendants caused the Company to fail to disclose either the non-final or the final rejection of the Patent.

### False and Misleading Statements

### August 2017 Forbes Article

96.     Defendant Dyer contributed to an article published by *Forbes* on August 8, 2017, titled "Polarity TE: Will this Biotech Be the Next Amazon or Tesla?" The article touted PolarityTE as the next big thing in biotech, stating that: "PolarityTE's technology — if it works — will be extremely disruptive to incumbents."

97.     The article further lauded the interest and investment of investor Phillip Frost in PolarityTE, stating, in relevant part:

Despite the promise of PolarityTE's technology, Lough and Swanson would likely never have resigned from Hopkins to pursue the venture without an innovative

27

financing model. . . Enter billionaire investor Philip Frost and his investment team. In the biotech sector, and especially in small cap ventures, there is no bigger name than Dr. Philip Frost. Across a career spanning over 40 years, Frost has built a net worth over 4 billion dollars, the vast majority of which derives from founding, buying, selling and investing in biotechnology companies.[12]

98.     The Forbes article was published after the Company filed a Registration Statement on Form S-3 on July 27, 2017, but prior to such Registration Statement being declared effective. The SEC expressed concern that the article constituted unlawful "gun-jumping" in oral communications with the Company and in a letter addressed to Defendant Lough dated August 23, 2017. Ultimately, the Company avoided liability by not offering the securities registered in the July 27, 2017 Form S-3 for more than thirty days after the *Forbes* article was published.

*Fox Business Interview*

99.     In an interview with Fox Business published on October 24, 2017, Defendant Lough said to Fox Business' Jade Scipioni, regarding the Company's SkinTE technology, that "We found out **this was sort of a novel technology and we ended up patenting it** and being approached by a variety of investors to say hey, why don't we bring this to market . . ."[13]

100.    As a result of Defendant Lough's misrepresentations, Fox Business stated in the article accompanying a video clip of the interview that "SkinTE, was developed last year by a team of former Johns Hopkins doctors who discovered a way to regenerate a patient's own skin **using their patented technology**."[14]

---

[12] On September 7, 2018, Philip Frost was named as a defendant in the SEC Action, which alleged his participation in "long running and fraudulent schemes" whereby he and others orchestrated pump-and-dump schemes involving small, publicly traded companies.

[13] Emphasis added.

[14] Emphasis added.

*2017 Proxy Statement*

101.   On September 13, 2017, the Company issued the 2017 Proxy Statement. Defendants Lough, Stetson, Swanson, Gorlin, Dyer, and Mogford solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[15]

102.   The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that:

> Our Code of Conduct (the "Code"), which was amended and restated as of August 11, 2017, applies to the Company's employees, directors, officers, contractors, consultants, and persons performing similar functions ("Covered Persons"). This includes our CEO and Chairman, our chief financial officer ("CFO"), and our Chief Operating Officer ("COO"), among others. We require that they avoid conflicts of interest, comply with applicable laws, protect Company assets, and conduct business in an ethical and responsible manner and in accordance with the Code. ***The Code prohibits employees from taking unfair advantage of our business partners, competitors, and employees through manipulation, concealment, misuse of confidential or privileged information, misrepresentation of material facts, or any other practice of unfair dealing or improper use of information***. The Code requires employees to comply with all applicable laws, rules, and regulations wherever in the world we conduct business. This includes applicable laws on privacy and data protection, anti-corruption and anti-bribery, and trade sanctions. Our Code was amended and restated in 2017 to better reflect our expanding operations and diverse employee base, enhance its clarity and general readability, and to make other stylistic changes to more closely align the Code with our overall brand. Our Code is publicly available and can be found on our website at http://www.polarityte.com/ by following the link to "Investors" and then to "Governance."
>
> If we make substantive amendments to the Code, or grant any waiver, including any implicit waiver, from a provision of the Code to our CEO and Chairman, CFO, controller/treasurer, and any of our other officers, financial professionals, and persons performing similar functions, we will disclose the nature of such amendment or waiver on our website or in a report filed with the SEC on Form 8-K.  [Emphasis added.]

---

[15] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

103.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public.

104.    The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

105.    Further, the 2017 Proxy Statement failed to disclose that: (1) the Patent received a non-final notice of rejection on May 31, 2017, prior to the closing of the Merger; (2) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent application; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

*November 3, 2017 Form 8-K*

106.    On November 3, 2017, the Company filed a Form 8-K with the SEC. In addition to revealing that the Company had received a notice of delisting from NASDAQ as a result of its failure to comply with the requirement that the Board be comprised of a majority of independent directors, the filing updated the Company's risk disclosures in light of the divestment of the Company's gaming business. Although the USPTO's non-final rejection had been issued some seven months earlier, the Form 8-K failed to disclose such information, stating, in relevant part:

***Our success depends significantly on our ability to protect our proprietary rights in technologies that presently consist of trade secrets and patent applications***. We currently have no issued patents relating to any of our product candidates. We intend to expand our patenting activities and rely on patent protection, as well as a combination of copyright, trade secret and trademark laws and nondisclosure, confidentiality and other contractual restrictions to protect our proprietary technology, and there can be no assurance these methods of protection will be effective. These legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. In addition, our presently pending patent applications include claims to material aspects of our activities that are not currently protected by issued patents. The patent application process can be time consuming and expensive. We cannot ensure that any of the pending patent applications we acquire, have acquired, or may file will result in issued patents. Competitors may be able to design around our patents or develop procedures that provide outcomes that are comparable or even superior to ours. We also cannot assure you that the inventors of the patents and applications that we expect to own or license were the first-to-invent or the first-inventor-to-file on the inventions, or that a third party will not claim ownership in one of our patents or patent applications. We cannot assure you that a third party does not have or will not obtain patents that dominate the patents we own or license now or in the future.

The failure to obtain and maintain patents and/or protect our intellectual property rights could have a material and adverse effect on our business, results of operations, and financial condition. We cannot be certain that, if challenged, any patents we ultimately obtain would be upheld because a determination of the validity of a patent involves complex issues of fact and law. If one or more of those patents is invalidated, that could reduce or eliminate any competitive advantage we might otherwise have had.

(Emphasis added.)

### BioInformant Interview

107.    On January 27, 2018, *BioInformant* published an interview held with Defendant Lough, during which Defendant Lough represented that the Company possessed patents for its technologies. The publication stated, in relevant part:

Cade Hildreth: How did you come up with the technology?

Dr. Denver Lough: That's a loaded question and ***being a public company with patented and proprietary materials***, I can't go into too much detail.

(Emphasis added.)

31

*2017 Form 10-K*

108.   On January 30, 2018, the Company filed its annual report on Form 10-K with the SEC for the fiscal quarter and year ended October 31, 2017 (the "2017 10-K"), signed by Defendants Lough, Stetson, Swanson, Dyer, Gorlin, and Mogford.

109.   The 2017 10-K discussed risks related to PolarityTE's intellectual property, stating, in relevant part:

> ***Our success depends significantly on our ability to protect our proprietary rights in technologies that presently consist of trade secrets and patent applications.*** We currently have no issued patents relating to any of our product candidates. We intend to expand our patenting activities and rely on patent protection, as well as a combination of copyright, trade secret and trademark laws and nondisclosure, confidentiality and other contractual restrictions to protect our proprietary technology, and there can be no assurance these methods of protection will be effective. These legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. In addition, our presently pending patent applications include claims to material aspects of our activities that are not currently protected by issued patents. The patent application process can be time consuming and expensive. We cannot ensure that any of the pending patent applications we acquire, have acquired, or may file will result in issued patents. Competitors may be able to design around our patents or develop procedures that provide outcomes that are comparable or even superior to ours.
>
> &#42; &#42; &#42;
>
> The failure to obtain and maintain patents and/or protect our intellectual property rights could have a material and adverse effect on our business, results of operations, and financial condition. We cannot be certain that, if challenged, any patents we ultimately obtain would be upheld because a determination of the validity and enforceability of a patent involves complex issues of fact and law. If one or more of any patents we obtain is invalidated and/or held unenforceable, such an outcome could reduce or eliminate any competitive advantage we might otherwise have had.

(Emphasis added.)

110.    Attached to the 2017 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lough and Stetson attesting to the accuracy of the 2017 10-K.

**Q1 208 10-Q**

111.    On March 19, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended January 31, 2018 (the "Q1 2018 10-Q"), signed by Defendants Lough, and Stetson.

112.    Regarding the Company's intellectual property, the Q1 2018 10-Q stated, in relevant part:

> ***Our success depends significantly on our ability to protect our proprietary rights in technologies that presently consist of trade secrets and patent applications.*** We currently have no issued patents relating to any of our product candidates. We intend to expand our patenting activities and rely on patent protection, as well as a combination of copyright, trade secret and trademark laws and nondisclosure, confidentiality and other contractual restrictions to protect our proprietary technology, and there can be no assurance these methods of protection will be effective. These legal means afford only limited protection and may not adequately protect our rights or permit us to gain or keep any competitive advantage. In addition, our presently pending patent applications include claims to material aspects of our activities that are not currently protected by issued patents. The patent application process can be time consuming and expensive. We cannot ensure that any of the pending patent applications we acquire, have acquired, or may file will result in issued patents. Competitors may be able to design around our patents or develop procedures that provide outcomes that are comparable or even superior to ours. We also cannot assure you that the inventors of the patents and applications that we expect to own or license were the first-to-invent or the first-inventor-to-file on the inventions, or that a third party will not claim ownership in one of our patents or patent applications. We cannot assure you that a third party does not have or will not obtain patents that could preclude us from practicing the patents we own or license now or in the future.
>
> The failure to obtain and maintain patents and/or protect our intellectual property rights could have a material and adverse effect on our business, results of operations, and financial condition. We cannot be certain that, if challenged, any patents we ultimately obtain would be upheld because a determination of the validity and enforceability of a patent involves complex issues of fact and law. If one or more of any patents we obtain is invalidated and/or held unenforceable, such

an outcome could reduce or eliminate any competitive advantage we might otherwise have had.

(Emphasis added.)

113.   Attached to the Q1 2018 10-Q were SOX certifications signed by Defendants Lough and Stetson, attesting to the accuracy of the Q1 2018 10-Q.

*May 29, 2018 Registration Statement*

114.   On May 29, 2018, the Company filed a S-8 Registration Statement (the "S-8 Statement") with the SEC, signed by Defendants Lough, Stetson, Swanson, Beeghley, Dyer, Bogan, Gorlin, and Mogford and dated May 28, 2018. The S-8 statement incorporated by reference the 2017 10-K, among other documents. Defendants Lough, Swanson, Dyer, Gorlin, Mogford, and Stetson were all among the selling stockholders listed in the S-8 Statement.

*June 18, 2018 Press Release*

115.   On June 18, 2018 the Individual Defendants caused the Company to issue a press release titled "PolarityTE Provides Corporate Update on Company Progress." Regarding the Company's patents, the press release stated, in relevant part:

> Twelve of the Company's U.S. trademark applications have been allowed and ***the Company is now in the active prosecution phase with all three of its U.S. non-provisional patent applications:  U.S. Application No. 14/954,335 published as US 2016/0151540;*** U.S. Application No. 15/650,656 published as US 2018/0154043; and U.S. Application No. 15/650,659 published as US 2018/0154044. The Company continues to actively file patent and trademark applications to protect its intellectual property and build out its patent portfolio as it relates to core cell-tissue biotechnologies and advanced related technology derivates (RTDs).

(Emphasis added.)

*Form 8-Ks*

116.    Between March 31, 2017 and June 22, 2018, the Individual Defendants caused the Company to file approximately 30 Form 8-Ks with the SEC. These filings provided promotional presentations about the Company and updates on pre-clinical trials, *inter alia*. However, none of these filings disclosed either the USPTO's non-final or final rejections of the patent.

117.    The statements referenced in ¶¶ 96, 97, 99, 100 and 106-116 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Patent received a non-final notice of rejection on May 31, 2017, prior to the closing of the Merger; (2) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent application; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times. Statements referenced in ¶¶ 115 and 116 were also false and misleading because they failed to disclose that a final rejection was assigned to the Patent on June 4, 2018.

**The Truth Emerges**

***Citron Research Report***

118.    Citron Research published a report on June 25, 2018, revealing rejections of the Patent by the USPTO.

119.    According to the Citron Research report, and as confirmed by the USPTO's website, the USPTO issued a non-final rejection of the Patent on March 31, 2017, and a final rejection of the Patent on June 4, 2018.

120.   On this news, the price per share of PolarityTE stock fell $10.59, or 27%, from the previous day's trading price, closing at $28.14 on June 25, 2018. The price of PolarityTE's stock continued to drop the following day, closing at $26.41 on June 26, 2018.

**False and Misleading Statements Continue**

121.   On June 27, 2018, the Individual Defendants caused the Company to issue a press release titled "PolarityTE Provides Update on Key Opinion Leader Event and Addresses Misleading Report." Regarding the Company's intellectual property, the press release stated, in relevant part:

> Regarding online statements about a "non-final rejection" and a "final rejection" notice from the USPTO, the Company notes that such statements refer to the receipt of office actions from the USPTO. Office actions are part of the normal patent prosecution process, and are received on the "notification date" identified on each office action. The Company is actively pursuing a variety of claims within multiple published non-provisional patent applications in the U.S. The prosecution dialogue between an applicant and the USPTO commonly includes a series of office actions as well as the applicant's responses to such office actions. It is common for a first office action to be referred to as a "non-final rejection," and for a second office action to be referred to as a "final rejection." Importantly, however, in each such instance the applicant has the opportunity to respond to the USPTO, as well as to continue prosecution thereafter. The Company recently received a second office action on one published patent application and is moving forward with a timely response. The process of patent prosecution before the USPTO can be lengthy. However, the Company does not feel that lack of issued patents should deprive patents of the very real potential benefits they can receive from our products in the interim.

122.   The press release continued, stating:

> ***Material Information about the Company's intellectual property and risks related to obtaining patent protection are disclosed in our SEC filings and reports.*** The Company has highlighted repeatedly throughout our SEC filings and reports that we have applied for patent protection, that we do not own any issued patents on our technology, and that we rely on protecting our processes and technologies by seeking patent protection as well as by maintaining certain aspects as trade secrets. Our objective is to build a portfolio of patents, in conjunction with the continued protection of our trade secrets and know-how, in order to further protect our regenerative medicine platform and derivative technologies, as well as the manufacturing and deployment processes of those technologies. [Emphasis added.]

36

123.    Regarding the Company's S-8 Statement, the June 27, 2018 press release stated, in relevant part:

> The Company strongly disputes any claim that any current directors or officers have sold shares of the Company's stock in the last 12 months. These contentions are a mischaracterization of basic SEC registration practice. Registration of the securities issuable under an incentive stock plan is a routine event and does not equate to a sale of shares. The Company filed a registration statement on Form S-8 with the SEC on May 29, 2018, which covers shares and options granted to its current and former employees and directors under the Company's incentive stock plan. The filing of a Form S-8 is a customary practice for publicly-held companies. None of the current officers and directors of the Company have sold shares. As is well known, directors, officers, and certain other insiders or affiliates are generally required to publicly report such sales within two days of sale. In addition, as the Company previously reported, its officers and directors continue to be subject to lock-up agreements that prohibit them from selling any shares until September 2018.

124.    On July 25, 2018, the Individual Defendants caused the Company to issue a press release providing a "Commercial Update." The press release stated, in relevant part:

> Despite the success observed with the initial roll out of SkinTE, there have been unsubstantiated rumors regarding the company and its lead product, SkinTE, by short sellers and competitors. While the company does not ordinarily comment on rumors and speculation, when these rumors start to affect SkinTE patients, their families, and their caregivers, we feel obligated to correct such misinformation. Individuals and/or groups on certain social media websites have recently engaged in deplorable attacks directed towards SkinTE patients and caregivers, and the Company condemns such disgusting and unacceptable bullying.
>
> The Company is not a "fraud," as known short sellers have claimed recently, and will not let these misrepresentations affect patients whose lives are at risk. There are many examples of patients whose lives have been positively affected by SkinTE, several of which were presented during the June 25, 2018 KOL summit in New York City.

125.    The statements referenced in ¶¶ 121-124 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent

application; (2) the Company failed to maintain internal controls; and (3) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

126.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

127.    Moreover, the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

128.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

## DAMAGES TO POLARITYTE

129.    As a direct and proximate result of the Individual Defendants' conduct, PolarityTE will lose and expend many millions of dollars.

130.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, CSO and Chairman as well as a member of its Board of Directors, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

131.    As a direct and proximate result of the Individual Defendants' conduct, PolarityTE has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

132.    Plaintiff brings this action derivatively and for the benefit of PolarityTE to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PolarityTE, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

133.    PolarityTE is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

134.    Plaintiff is, and has been at all relevant times, a shareholder of PolarityTE. Plaintiff will adequately and fairly represent the interests of PolarityTE in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

135.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

136.    A pre-suit demand on the Board of PolarityTE is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Lough, Bogan, Dyer, Gorlin, and Mogford (the "Director-Defendants") and non-parties Peter A. Cohen, Rainer Erdtmann, and David Seaburg (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

137.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and

misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

138.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

139.   The Director-Defendants knew of the falsity of the misleading statements at the time they were made. The development and commercialization of regenerative medicine technologies based on the Patent is the core operation of PolarityTE. The Patent is highly material to the Company's core operations: it was the only asset acquired through the Merger and the technology underpins all of the Company's potential products.

140.   As Board members of PolarityTE, charged with overseeing the Company's affairs, Director-Defendants Lough, Bogan, Dyer, Gorlin, and Mogford all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of PolarityTE, Defendants Lough, Bogan, Dyer, Gorlin, and Mogford must have been aware of the material facts surrounding the Patent described herein, including USPTO's non-final and final rejections of the Patent.

141.   This inference of actual knowledge of the falsity of the misleading statements and omissions at issue is further supported by representations on the Company's website that Defendant Lough "is experienced with IP and patent evolution, investment strategy, regulatory

pathway systems, CLIA/ GLP manufacturing platforms, legal due diligence and business development."

142. Therefore, Director-Defendants Lough, Bogan, Dyer, Gorlin, and Mogford each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

143. Additional reasons that demand on Defendant Lough is futile follow. Defendant Lough has served as a Company director since December 2016 and serves as Chairman of the Board. He also serves as the Company's CEO and CSO, and is thus, as the Company admits, a non-independent director. He receives handsome compensation, including $2,536,250 in the fiscal year ended October 31, 2017. His base compensation was further raised as of November 17, 2017. His large Company stock holding, representing a 36.3% ownership of the Company, reveals his control over the other Directors and the Company. As Chairman of the Board, CEO, and CSO he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lough signed, and thus personally made the false and misleading statements in, the 2017 10-K and S-8 Statement referenced herein, in addition to falsely representing that the Company possesses patents for its technology in multiple interviews. Furthermore, Defendant Lough is a defendant in the Securities Class Actions. For these reasons, too, Defendant Lough breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Dyer is futile follow. Defendant Dyer has served as a Company director since March 2, 2017, and serves as Chair of the Audit Committee. He receives handsome compensation, including $292,699 in the fiscal year ended October 31, 2017. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Dyer signed, and thus personally made the false and misleading statements in, the 2017 10-K and S-8 Statement referenced herein. He also personally contributed to the false and misleading *Forbes* article published on August 8, 2017. Furthermore, Defendant Dyer is a defendant in the Securities Class Actions. For these reasons, too, Defendant Dyer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Gorlin is futile follow. Defendant Gorlin has served as a Company director since February 2017 and serves as a member of the Audit Committee. He receives handsome compensation, including $400,688 in the fiscal year ended October 31, 2017. As a member of the Audit Committee and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Gorlin signed, and thus personally made the false and misleading statements in, the 2017 10-K and S-8 Statement referenced herein. For these reasons, too, Defendant Gorlin

breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

146.   Additional reasons that demand on Defendant Mogford is futile follow. Defendant Mogford has served as a Company director since February 2017. He receives handsome compensation, including $400,688 in the fiscal year ended October 31, 2017. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Mogford signed, and thus personally made the false and misleading statements in, the 2017 10-K referenced herein. For these reasons, too, Defendant Mogford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.   Additional reasons that demand on Defendant Bogan is futile follow. Defendant Bogan has served as a Company director since April 2018. As a trusted Company director and an experienced business and securities attorney with extensive corporate governance experience, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets from the time that he joined the Board in April 2018. Moreover, Defendant Bogan signed, and thus personally made the false and misleading statements in, the S-8 Statement referenced herein. For these reasons, too, Defendant Bogan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on non-party David Seaburg ("Seaburg") is futile follow. Seaburg has served as a Company director since August 2018. Subsequent to his election to the Board, Seaburg and the Company entered into a written consulting agreement "pursuant to which [Seaburg] will provide investor relations and other services to the Company over a period of two years for a fee consisting of (i) quarter-annual cash payment of $10,000, (ii) 60,000 restricted stock units issued under the Company equity incentive plan that vest in four equal installments every six months during the term of the agreement subject to continued service, and (iii) an annual award under the Company equity incentive plan of options exercisable over a term of 10 years to purchase common stock in number equal to the number of shares of common stock with a value of $150,000 at the time of the award based on a Black-Scholes calculation." Thus, as the Company admits, Seaburg is a non-independent director. For these reasons, too, Seaburg is not independent, and thus demand upon him is futile and, therefore, excused.

149.    Additional reasons that demand on the Board is futile follow.

150.    Demand in this case is excused because the Directors are beholden to and controlled by Director-Defendant Lough, who controls the Company by virtue of his share ownership, representing 36.3% of the Company's outstanding common stock as of August 9, 2018. These shareholdings provide Director-Defendant Lough with significant control over the continued employment of the remaining Directors, especially Seaburg, who is party to a consulting agreement with the Company. All of the Directors are also beholden to Director-Defendant Lough because of the handsome compensation they receive as Directors—on November 10, 2017, the Company approved a new Director Compensation Policy, under which non-employee directors are entitled to increased fees and stock options.[16] Thus, the Directors are unable to evaluate a

---

[16] As reported in the 2018 Proxy Statement:

During the fiscal year ended October 31, 2017, our directors were compensated in accordance with the following terms. Each non-employee director received an annual cash retainer of $5,000, other than the Chair of the Company's Audit Committee, who received $6,000. In addition, the Chairman of the Board of Directors received an additional annual cash retainer of $10,000.

Each non-employee director was also entitled to receive 5-year options to purchase shares of the Company's Common Stock valued at $10,000, calculated by dividing $10,000 by the closing stock price on the date the award was granted. The options vest in full six months after the grant date, provided the applicable director is still serving on the Board of Directors.

Each non-employee director was entitled to a fee of $2,500 for each Board meeting at which the director was present in person, and each member of our Board committees was entitled to a fee of $800 for each committee meeting at which the director was present in person. Each non-employee director was entitled to a fee of $300 for each teleconference called by either the Chairman of the Board of Directors, the President of the Company or the Chairman of a Board committee.

On November 10, 2017, the Board of Directors approved a new Director Compensation Policy. At this time our non-employee directors participating under the Director Compensation Policy are Steve Gorlin, Jon Mogford, Jeff Dyer, Willie C. Bogan, Peter A. Cohen, and Rainer Erdtmann. Under the new policy, our directors will be compensated in accordance with the following terms.

- Each non-employee director receives a quarterly cash retainer of $10,000. The Company's Audit Committee Chairman receives a $15,000 annual Service Fee, the Compensation Committee Chairman receives a $10,000 annual service fee, and the Nominating and Corporate Governance Committee Chairman receives an $8,000 annual service fee.

- Each non-employee director is entitled to receive 10-year options under the Company equity incentive plan to purchase that number of shares of the Company's Common Stock valued at $150,000, calculated by dividing $150,000 by the Black-Scholes value of the stock options based on the closing stock price the day the stock options are awarded.

- Each non-employee director is entitled to a fee of $1,500 for each Board of Directors meeting at which the director is present in person, and each member of our Board committees is entitled to a fee of $800 for each committee meeting at which the director is present in person. Each non-employee director is entitled to a fee of $500 for each teleconference called by either the Chairman of the Board of Directors, the President of the Company or the Chairman of a Board of Directors committee.

demand with disinterest or independence as a result of Director-Defendant Lough's control over them and his substantial likelihood of liability in the Securities Class Actions and in the present action, and demand is excused as to all of the directors.

151.   The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

152.   For example:

(a)   As the Company admits, Defendants Lough and Dyer are related by marriage.

(b)   Defendant Gorlin is the Principal and Founder of Gorlin Companies. Defendant Mogford is the CEO and past Vice Chancellor of Research at Gorlin Companies.

(c)   Defendants Gorlin and Mogford have also served together on the board of Medovex Corp. Defendant Gorlin previously served as the Co-Chairman of the board of Medovex Corp. and Defendant Gorlin's son, Jarrett Gorlin, is currently the CEO and a director of Medovex Corp. Defendant Mogford remains on the board of Medovex Corp.

These personal and professional connections, combined with the substantial likelihood of liability that Defendant Lough faces in the Securities Class Action and that Defendants Lough, Dyer, Gorlin, and Mogford face in the instant action, prevent Defendants Lough, Dyer, Gorlin, and Mogford from evaluating a demand with independence or disinterest.

153.   All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The

Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

154.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

155.   PolarityTE has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for PolarityTE any part of the damages PolarityTE suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

156.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

157.    The acts complained of herein constitute violations of fiduciary duties owed by PolarityTE's officers and directors, and these acts are incapable of ratification.

158.    The Director-Defendants may also be protected against personal liability for their breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of PolarityTE. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of PolarityTE, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

159.    If there is no directors' and officers' liability insurance, then the Directors will not cause PolarityTE to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

160.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

161.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

162.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

163.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

164.   Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

165.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose that: (1) the Patent received a non-final notice of rejection on May 31, 2017, prior to the closing of the Merger; (2) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent application; (3) the Company failed to maintain internal controls; and (4) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

166.    Moreover, the 2017 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein.

167.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors, an advisory vote on executive compensation ("Say-on-Pay") and ratification of the appointment of an independent registered public accounting firm.

168.    The false and misleading elements of the 2017 Proxy Statement led to the re-election of Defendants Lough, Swanson, and Stetson, which allowed them to continue breaching their fiduciary duties to PolarityTE.

169.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

170.    Plaintiff on behalf of PolarityTE has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PolarityTE's business and affairs.

173.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

174.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PolarityTE.

175.    In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

176.    In further breach of their fiduciary duties owed to PolarityTE, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Patent received a non-final notice of rejection on May 31, 2017, prior to the closing of the Merger; (2) a final rejection was assigned to the Patent on June 4, 2018; (3) the commercial viability of the Company was overstated in light of the USPTO's rejection of the patent application; (4) the Company failed to

maintain internal controls; and (5) due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

177.   The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

178.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PolarityTE's securities.

179.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PolarityTE's securities.

180.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PolarityTE has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182.   Plaintiff on behalf of PolarityTE has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

183.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PolarityTE.

185.   The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from PolarityTE that was tied to the performance or artificially inflated valuation of PolarityTE, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

186.   Plaintiff, as a shareholder and a representative of PolarityTE, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

187.   Plaintiff on behalf of PolarityTE has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of PolarityTE, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to PolarityTE;

(c)     Determining and awarding to PolarityTE the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing PolarityTE and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PolarityTE and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of PolarityTE to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding PolarityTE restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated this 10th day of October, 2018

Respectfully submitted,

*/s/ Mark F. James*
Mark F. James
**HATCH, JAMES & DODGE, P.C.**


Phillip Kim
**THE ROSEN LAW FIRM, P.A.**


Timothy W. Brown
**THE BROWN LAW FIRM, P.C.**

*Counsel for Plaintiff*

<u>VERIFICATION</u>

I, Henry Mothner am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of September 2018.

10/6/2018 4:11:26 PM PDT

Henry Mothner

DA5219F2G325441...

Henry Mothner